Lillie **BENALLY** and Grant Benally on Behalf of Norman **BENALLY,** an adult, Plaintiffs–Appellants,

v.

**AMON CARTER MUSEUM OF WESTERN ART, Defendant–Appellee.**

No. 85–2838.

United States Court of Appeals, Tenth Circuit.

Oct. 3, 1988.

Stephen T. LeCuyer, Mettler & LeCuyer, Shiprock, N.M., for plaintiffs-appellants.

Stephen L. Tatum of Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, Tex. (Arthur O. Beach and Margaret E. Davidson of Keleher & McLeod, Albuquerque, N.M., with him on the brief), for defendant-appellee.

Before LOGAN, ANDERSON, and TACHA, Circuit Judges.

LOGAN, Circuit Judge.

Plaintiffs Lillie Benally and Grant Benally, on behalf of Norman Benally, appeal the district court's dismissal, for lack of personal jurisdiction, of their invasion of privacy claims against defendant Amon Carter Museum of Western Art (the Museum). The district court's decision is reported as *Benally v. Hundred Arrows Press, Inc.*, 614 F.Supp. 969 (D.N.M.1985). The issues on appeal are (1) whether the New Mexico long-arm statute, N.M.Stat.Ann. § 38–1–16, permits the exercise of diversity jurisdiction over the Museum, and if so, (2) whether the exercise of jurisdiction in New Mexico over the Museum would offend the "traditional notions of fair play and substantial justice" embodied in the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

Plaintiffs are Navajo Indians and domiciliaries of New Mexico. In 1932, artist Laura Gilpin photographed Lillie Benally in native dress in her home holding her baby, Norman, in a cradleboard. Lillie Benally granted Gilpin permission to take the photograph, but allegedly neither she nor anyone else in her family ever authorized its publication or public exhibition. The photograph, entitled "Navaho Madonna," became part of Gilpin's collection. Gilpin became famous, and before her death on November 30, 1979, the print had been published on a postcard and in three books and two magazines, and exhibited at least thirty-five times throughout the United States.

The defendant Museum is a nonprofit corporation organized under Texas law and has its principal place of business in Fort Worth, Texas. In April 1978, Mitchell Wil-

der, the Museum director, reported to the Museum's board of directors that Gilpin would bequeath her photographic collection, including the Benally photograph, to the Museum; the gift was to be announced in May 1978 in conjunction with an exhibition of Gilpin's works by the Museum. Over the next eighteen months, the Museum negotiated with Gilpin over the specific plans for the collection after her death. In June 1978, Wilder reported that he had spent almost a week in Santa Fe, New Mexico, working with Gilpin on plans for the collection. He returned from New Mexico with some of Gilpin's original nitrate negatives to work on methods of preserving them. In July 1978, the Museum hired Rosamund Kolberg to transfer the negatives to acid-free envelopes; she worked several months in Santa Fe, transferring and cataloging the negatives for use in the Museum. An internal memorandum dated July 27, 1978, proposed, and the Museum director agreed, that the Museum pay "all expenses incurred in the wooing and acquiring [of] Miss Gilpin's photographic collection" out of the Museum's account for acquiring photographs and treat these expenses on the Museum's books as part of the cost of the collection. I R., Exh. 4 at 5.

In August 1979, Ron Tyler, the Museum's acting director, and Martha Ann Sandweiss, the curator of photographs, met with Gilpin and her attorney in Santa Fe. The Museum also produced, in collaboration with a Texas film maker, a documentary film about Gilpin and her work. By September 30, 1979, fifteen days of filming in Santa Fe had been completed. In October 1979, the Museum corresponded with Gilpin's attorney in Santa Fe about an agreement obligating the Museum to preserve the collection and dictating the conditions under which the Museum could exhibit, duplicate, and sell prints from the collection. Gilpin's attorney sent a draft of this agreement to Tyler on October 1. On October 10, 1979, Tyler wrote Gilpin's attorney in New Mexico proposing a change in the agreement to allow the Museum to make the Gilpin Collection available to the public according to the Museum's normal restrictions. Tyler, the next day, and Sandweiss, on October 23, telephoned Gilpin's attorney to discuss the agreement. An amended Gilpin–Museum agreement was signed by Gilpin in October 1979 and by Tyler in November 1979. The Museum's board of directors ratified it on November 15, 1979.

Gilpin died on November 30, 1979, bequeathing, with certain exceptions, her entire photographic library to the Museum. The bequest included the negative and nine prints of the Benally photograph. Her will was executed and probated in New Mexico. Sandweiss traveled to New Mexico to supervise the packing and shipment of the photographs in Gilpin's possession at the time of her death.

The Gilpin–Museum agreement requires the Museum to report annually on the use, maintenance, and activities of the Gilpin Collection to a three-person committee, which includes Richard Rudisill of Santa Fe, New Mexico. Pursuant to this agreement, Sandweiss submitted annual reports to Rudisill in Santa Fe in October 1980, September 1981, October 1982, and October 1983. In the 1983 report Sandweiss advised that the Henry Luce Foundation had given a grant of $125,000 to the Museum to support further work on the Gilpin Collection, including a biography of Gilpin. Sandweiss stated that she planned to go to Santa Fe for three months in 1984 to work on the biography.

In February 1980, the Museum provided copies of several photographs from the Gilpin Collection, including "Navaho Madonna," to *Four Winds* magazine in Austin, Texas, for use with a story by Sandweiss entitled "Laura Gilpin's Indians—An Enduring Image." The Museum charged $5.00 for each print it sent to the magazine. *Four Winds* ran the story in its Autumn 1980 issue and displayed the Benally photograph on its cover. Pursuant to the Museum's regulations for reproducing photographs, the magazine provided a credit line under the photograph reading "Courtesy Laura Gilpin Collection, Amon Carter Museum, Fort Worth, Texas." I R. 54, Exh. 11 at 1.

In August 1981, Lillie Benally's daughter-in-law, Sophie Benally, learned of and informed plaintiffs about the publication of the photograph; at that time plaintiffs were not aware that the photograph had been exhibited and published previously. Plaintiffs objected to the photograph's reproduction because of the traditional Navajo belief that the publication of photographs can have bad effects on the people in the photographs.

The photograph was published twice in Texas-based magazines in 1981. *Southwest Art* published it with a story about Gilpin written by Michael Duty, who was then the Museum's public relations and development officer. The magazine gave a credit line to the Museum with the story. The Museum also provided the print for use with a story in *Texas Monthly* about the Museum's twentieth anniversary. It was the only photograph from the Gilpin Collection to appear with the story.

In March 1984, plaintiffs sued the Museum, the publishers of *Four Winds, Southwest Art* and *Texas Monthly,* and Communications Specialists, Inc. (CSI)[1] in the federal district court in New Mexico for unlawful public disclosure of private facts and misappropriation of likeness. The Museum entered a special appearance seeking to dismiss the claims against it for lack of personal jurisdiction, and the district court granted the Museum's motion. The magazine publishers, who are all Texas residents, did not contest jurisdiction but moved to dismiss the claims pursuant to Fed.R.Civ.P. 12(b)(6). The court treated their motions as motions for summary judgment and granted them. *Benally,* 614 F.Supp. at 976, 980–83. Plaintiffs do not appeal the entry of summary judgment; they challenge only the district court's decision that it lacked personal jurisdiction over the Museum.

## I

Federal courts sitting in diversity have personal jurisdiction over nonresident de-

fendants to the extent permitted by the law of the forum. *See Fidelity & Casualty Co. of N.Y. v. Philadelphia Resins Corp.,* 766 F.2d 440, 442 (10th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 853, 88 L.Ed. 2d 893 (1986). New Mexico's long-arm statute provides in pertinent part as follows:

> "Any person, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts enumerated in this subsection thereby submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from:
>
> (1) the transaction of any business within this state;
>
> . . . .
>
> (3) the commission of a tortious act within this state; . . . ."

N.M.Stat.Ann. § 38–1–16(A). New Mexico courts apply a three-step test to determine whether they have personal jurisdiction over nonresident defendants: "(1) the act must be enumerated in the long-arm statute, [N.M.Stat.Ann. § 38–1–16(A) ]; (2) plaintiff's cause of action must arise from the act, [*id.* § 38–1–16(C) ]; and (3) the act(s) of defendant must establish the minimum contacts necessary to satisfy due process." *Salas v. Homestake Enterprises, Inc.,* 106 N.M. 344, 742 P.2d 1049, 1050 (1987).

## A

The first step of this test requires us to determine whether the Museum committed an act enumerated in the long-arm statute. Plaintiffs assert that the Museum comes within the long-arm statute because it has "transacted business" within New Mexico.

The Museum's first line of defense against this argument is that, as a nonprofit organization, whatever it did in New Mexico cannot be characterized as "transacting business." The only New Mexico

---

**1.** CSI used the "Navaho Madonna" photograph in an advertisement in the Autumn 1980 issue of *Four Winds.* The Museum did not authorize CSI's use of the photograph. Although the district court denied CSI's motion for summary judgment, plaintiffs subsequently entered a voluntary dismissal of their claims against CSI with prejudice pursuant to Fed.R.Civ.P. 41.

case we found explicitly involving a nonprofit corporation is *Valley Wide Health Services, Inc. v. Graham*, 106 N.M. 71, 738 P.2d 1316 (1987), which held that the nonresident corporation was not subject to the jurisdiction of the New Mexico courts. But the court's decision rested on the finding of no purposefully initiated activity within the state, and the court did not discuss whether the activities of a nonprofit corporation could be characterized as transacting business within the meaning of the New Mexico long-arm statute.

Lacking anything in the language of the statute itself, any cases interpreting the statute, or any legislative history, we look for guidance to other courts that have considered the issue. Some courts have used different semantics in describing the activities of nonprofit corporations. *E.g., Publications Group v. American Soc. of Heating, Refrigerating & Air Conditioning Eng'rs, Inc.*, 566 F.Supp. 316, 319 n. 1 (D.Conn.1983) (nonstock corporations ... "conduct affairs"; they generally do not "transact business"); *Sales Arm, Inc. v. Automobile Club of S. Cal.*, 402 F.Supp. 763, 765 (S.D.N.Y.1975) (nonprofit auto club did not "conduct business in the usual commercial sense"). But we have found no cases in which foreign nonprofit organizations with significant contacts within a state carrying out its purposes have been allowed to escape the reach of the state court's long-arm statute, and we have found a number in which jurisdiction was upheld. *See Weinberg v. Colonial Williamsburg, Inc.*, 215 F.Supp. 633, 639–40 (E.D.N.Y.1963); *Steel Joist Inst., Inc. v. J.H. Mann, III, Inc.*, 171 So.2d 625, 627 (Fla.Dist.Ct.App.) (for purposes of long-arm statute, "[a] non-profit corporation's business is whatever functions it has been organized to perform"), *cert. dismissed,* 179 So.2d 211 (Fla.1965); *Bankers Leasing Co. v. Eagle Valley Environmentalists, Inc.*, 387 N.W.2d 380, 383 (Iowa Ct.App.1986); *Novack v. Nat'l Hot Rod Ass'n*, 247 Md. 350, 231 A.2d 22, 26 (1967); *Galatz v. Eighth Judicial Dist. Court*, 100 Nev. 408, 683 P.2d 26, 28 (1984) (per curiam), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985); *Barile v. Univ. of Va.*, 2 Ohio App.3d 233, 441 N.E.2d 608, 615–16 (1981); *Jacobs v. Association of Independent Colleges and Schools*, 265 S.C. 459, 219 S.E.2d 837, 840 (1975); *see also Fontanetta v. American Bd. of Internal Medicine*, 303 F.Supp. 427, 429–30 (E.D.N.Y. 1969), (construing New York law) (nonprofit corporation within long-arm statute, but finding case did not "arise from" contacts with forum), *aff'd,* 421 F.2d 355 (2d Cir. 1970). Several other decisions involving long-arm jurisdiction over nonresident individuals who asserted they did not engage in commercial activities have rejected arguments that "transacting business" is limited to commercial activity. *See, e.g., San Juan Hotel Corp. v. Lefkowitz*, 277 F.Supp. 28, 30 (D.P.R.1967); *Woodring v. Hall*, 200 Kan. 597, 438 P.2d 135, 143–45 (1968); *Ross v. Ross*, 371 Mass. 439, 358 N.E.2d 437, 439 (1976); *Trustees of the Sheppard and Enoch Pratt Hosp. v. Smith*, 114 R.I. 181, 330 A.2d 804, 806–07 (1975) (construing Maryland statute).

*Lewis v. Curry College*, 89 Wash.2d 565, 573 P.2d 1312 (1978), relied upon by the Museum, does not support its position. Although the *Lewis* court did indeed hold that a nonresident nonprofit college was not subject to personal jurisdiction, it based this conclusion on the lack of contacts between the college and the forum state, and not on the college's nonprofit status. *Id.,* 573 P.2d at 1315.

With the advent of nonprofit trade or professional organizations, reliance upon traditional notions of what constitutes "business" becomes somewhat attenuated, as the cases indicate. *See, e.g., Fontanetta v. American Bd. of Internal Medicine*, 421 F.2d 355, 357 (2d Cir.1970) (it would constitute a "considerable strain" to characterize medical organization's certifying activities as noncommercial since they had "direct professional and financial effect upon the doctors involved").

In the case *sub judice*, the Museum epitomizes the "pure" nonprofit organization, at the extreme end of the commercial-noncommercial continuum. Nevertheless, a common thread running through profit and nonprofit organizations alike, regardless of

their degree of commerciality, is that all exist to achieve a purpose. "Business" has been defined not only as a commercial venture, but also as an activity that engages a person's serious attentions or constitutes a livelihood. *See Black's Law Dictionary* 179 (5th ed. 1979). No organization carries out its activities or achieves its objectives except through the people running it. So whether an organization's purpose is commercial in nature, or it exists only to promote cultural values, it must still conduct "business."

■ This conclusion makes sense within the context of New Mexico's long-arm statute. When a wrong results from purposeful, organized activity, in terms of a state's interest in redressing harm to its citizens, it makes little difference whether that activity was of a commercial character or not. Although it was writing in a commercial activity context in *Telephonic, Inc. v. Rosenblum*, 88 N.M. 532, 543 P.2d 825, 827 (1975), the New Mexico Supreme Court equated "transaction of any business" with " 'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, *or otherwise accomplishing an object,* or doing a single act for such purpose with the intention of thereby initiating a series of such acts.' " 543 P.2d at 827 (quoting *Restatement (Second) of Conflict of Laws* § 35 comment a (1971) (emphasis added)). We believe the New Mexico Supreme Court would hold that the Museum "transacts business" within the meaning of the state's long-arm statute whenever it engages in activities designed to further its purposes, objectives or goals.

■ We also hold that the Museum's activities in New Mexico, most of which we have set out above, taken together rise to the level of "transacting business" under § 38–1–16(A). The New Mexico Supreme Court has "repeatedly equated the 'transaction of business'—insofar as the acquisition of long-arm jurisdiction is concerned—with the due process standard of 'minimum

contacts' sufficient to satisfy" federal constitutional due process standards. *Telephonic, Inc.*, 543 P.2d at 827. Thus, under this standard, the inquiry becomes whether a party's business activities constituted a "purposeful availment" of the privilege of conducting activities within the forum state. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *post* at 625–26.[2] We defer further discussion of this aspect to Part II. See *post* at 624–26.

B

Having found that the Museum transacted business within the state of New Mexico, we now must determine whether plaintiffs' action arises from those activities, as required by N.M.Stat.Ann. § 38–1–16(C). The district court held that plaintiffs' cause of action was not sufficiently related to the Museum's transaction of business to support jurisdiction because of the time lapse between most of the Museum's activities in New Mexico and the distribution of the photograph of which plaintiffs complain. *See Benally*, 614 F.Supp. at 973.

The district court did not cite, nor have we found, any case requiring that the activities giving rise to jurisdiction occur within a specific time period from the accrual of the plaintiffs' cause of action. Rather, the New Mexico standard to determine whether the cause of action is one arising from the transaction of business in the state focuses on the logical relationship between the cause of action and that transaction of business. According to the New Mexico Supreme Court,

"There must be a close relationship between [a nonresident defendant's] jurisdictional activities and the cause of action. . . . '[T]he statutory phrase "arising from" requires only that the plaintiff's claim be one which lies in the wake of the commercial activities by which the defendant submitted to the jurisdiction of [the forum's] courts.' "

*tional Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *post* at 626.

---

**2.** Of course, the constitutional analysis also includes an inquiry as to whether an assertion of jurisdiction would comport with fundamental notions of justice and fair play. *See Interna-*

*Winward v. Holly Creek Mills, Inc.,* 83 N.M. 469, 493 P.2d 954, 957 (1972) (quoting *Koplin v. Thomas, Haab & Botts,* 73 Ill. App.2d 242, 219 N.E.2d 646, 651 (1966)).

The instant case is analogous to *Kathrein v. Parkview Meadows, Inc.,* 102 N.M. 75, 691 P.2d 462 (1984), in which the plaintiff's cause of action for emotional and psychological trauma allegedly inflicted at an alcohol treatment center in Arizona was held to arise out of the defendant's solicitations of plaintiff and her husband in New Mexico. In concluding that these facts satisfied the "arising out of" requirement of § 38–1–16(C), the New Mexico Supreme Court stated that

> "defendant's invitation to plaintiff to attend the program's Family Week, and plaintiff's subsequent attendance, were an integral part of defendant's overall program of alcoholic treatment. The invitation followed by attendance were a direct outgrowth of defendant's general solicitation for business in New Mexico. This cause of action does arise out of defendant's solicitation of business in New Mexico."

*Kathrein,* 691 P.2d at 463.

The court further reasoned as follows:

> "Given the level of defendant's activity within New Mexico, it seems fair to say that its conduct in this State was entirely voluntary, and that it reasonably could have contemplated being subject to New Mexico jurisdiction.... It is not singly significant to the result we reach that plaintiff travelled to Arizona to attend 'Family Week.' Plaintiff went there to participate in the treatment program which her husband was attending as a result of defendant's earlier solicitation in New Mexico. Defendant's total activities in New Mexico were sufficient to subject defendant to the jurisdiction of the New Mexico court in this case."

*Id.,* 691 P.2d at 464.

The plaintiffs' cause of action in the case at bar, as in *Kathrein,* "lies in the wake"

of the Museum's transaction of business in New Mexico. Plaintiffs' claim for invasion of privacy against the Museum is closely and logically related to the Museum's actions in soliciting from a New Mexico resident the gift of the Gilpin Collection, in taking possession of the collection in New Mexico, and in publicizing its ownership of the collection through magazine articles distributed in New Mexico. The causal relationship between the jurisdictional activities and the cause of action is at least as strong here as in *Kathrein. See also Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215–16 (7th Cir.1984) (because discussions in Illinois played a part in subsequent out-of-state negotiations, breach of warranty claim arising from those negotiations, "lies in the wake of" defendant's activities in Illinois, subjecting it to jurisdiction under state's long-arm statute); *cf. GTP Leisure Products, Inc. v. B–W Footwear Co.,* 55 A.D.2d 1009, 391 N.Y.S.2d 489, 490 (1977) (mem.) ("When a non-domiciliary engages in a purposeful business transaction in New York and makes a defamatory statement outside of New York about that specific transaction, New York courts may exercise jurisdiction over his person for a cause of action based upon the defamatory statement."). We hold that the Museum is subject to service of process under the New Mexico long-arm statute.[3]

## II

██ We also decide whether the exercise of jurisdiction over the Museum comports with the Due Process Clause of the Fourteenth Amendment. The central inquiry is whether the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61

3. Because we hold that the Museum's transaction of business within New Mexico supports jurisdiction, we need not address plaintiffs' alternate argument that the Museum is subject to jurisdiction in New Mexico under the "tortious act" provision. *See* N.M.Stat.Ann. § 38–1–16(A)(3).

S.Ct. 339, 343, 85 L.Ed. 278 (1940)). The Constitution further requires that a defendant's contacts with the forum state be the purposeful activities of that defendant and not the result of activities of others in that state:

> "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958).

In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Supreme Court elaborated upon this principle as follows:

> "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, *Keeton v. Hustler Magazine, Inc.,* [465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)]; *World–Wide Volkswagen Corp. v. Woodson,* [444 U.S. 286, 299, 100 S.Ct. 559, 568, 62 L.Ed.2d 490 (1980)], or of the 'unilateral activity of another party or a third person,' *Helicopteros Nacionales de Colombia, S.A. v. Hall,* [466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984)]. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State. *McGee v. International Life Insurance Co.,* [355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)]; see also *Kulko v. California Superior Court,* [436 U.S. 84, 94 n. 7, 98 S.Ct. 1690, 1698 n. 7, 56 L.Ed.2d 132 (1978)]. Thus where the defendant 'deliberately' has engaged in significant activities within a State, *Keeton v. Hustler Magazine, Inc.* [465 U.S. at 781, 104 S.Ct. at 1481], or has created 'continuing obligations' between himself and residents of the forum, *Travelers Health Assn. v. Virginia,* [339 U.S. 643, 648, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950)], he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."

*Id.* at 475–76, 105 S.Ct. at 2183–84 (emphasis in original) (footnote omitted).

In holding that the contacts of the Museum with New Mexico were not sufficiently purposeful to subject the Museum to jurisdiction in the state, the district court reasoned as follows:

> "Prior to August, 1981, the last loan of art work(s) by the defendant to a museum in New Mexico was in 1979. The Museum has only made ten such loans in the past twenty-four years and all have been on a not-for-profit basis. Of the two books published by the Museum in conjunction with the University of New Mexico Press, one has been out of print since 1974 and the other was not published until two years after the plaintiffs' cause of action arose. Neither book includes the photograph in question. Although the Museum bookstore fills orders sent by New Mexico residents, such sales have only amounted to approximately .0173 percent of the bookstore's annual sales for each of the years between 1977 and 1984. Furthermore, the Museum's book purchases from New Mexico residents have been infrequent in the past five years, and their acquisitions of New Mexico artists' photographs and prints have primarily been a result of solicitation by New Mexico resident dealers and brokers. All purchases were consummated in Texas and all were for exhibition or educational purposes and not for profit. The Museum has never published or exhibited the photograph in question in New Mexico, nor has it ever provided any New Mexico resident with

the photograph for exhibition in this state."

*Benally,* 614 F.Supp. at 975 (footnote omitted). Although the district court may have been correct in its conclusion that these contacts were not enough, the court ignored other important contacts between the Museum and New Mexico.

In our view, the Museum's activities in New Mexico—soliciting the devise of the Gilpin Collection, negotiating the terms of the collection's maintenance and exhibition, traveling to New Mexico to take possession of the collection, and invoking the benefits of New Mexico's laws of testamentary disposition [4]—are significant to the jurisdictional inquiry in a dispute involving an item in the collection impacting on a New Mexico resident. Also significant are the Museum's acceptance of a continuing obligation to report annually to a New Mexico resident about the collection and its consent to the publication of the Benally photograph and other works in regional publications that are circulated in New Mexico. These additional activities manifest a purposeful intent to conduct business in New Mexico, with a citizen of that state and under the protection of its laws.

Finally, we must determine whether, given the Museum's minimum contacts with New Mexico, "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160); *see generally* Maltz, *Unraveling the Conundrum of the Law of Personal Jurisdiction: A Comment on* Asahi Metal Industry Co. v. Superior Court of California, 1987 Duke L.J. 669, 680–81. This inquiry considers "the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief," as well as the interests of the several states in resolving cases efficiently and in furthering social policies. *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987). The Museum has not convinced us that these factors make New Mexico's assertion of jurisdiction inconsistent with "fair play and substantial justice." The burden on the Museum is relatively slight; it is located in an adjacent state. Further, plaintiffs are residents of New Mexico, which itself has an interest in asserting jurisdiction over claims involving injuries allegedly suffered in the state by its residents. The dispute involves an item in a photograph collection the defendant Museum solicited from a New Mexico resident by activities many of which were in New Mexico.

For the reasons stated, we hold that the Museum is subject to jurisdiction in New Mexico under N.M.Stat.Ann. § 38–1–16 and that the exercise of such jurisdiction is constitutional.

### III

The district court treated the merits of plaintiffs' claims against the non-Museum defendants, finding for those defendants on the merits or by upholding their defense of the statute of limitations. On appeal the Museum's answer brief discussed the merits, relying upon the district court's decision favoring others, in arguing that no tortious act occurred in New Mexico. We construe its brief to ask that we address the merits as an alternative ground to support the district court's judgment for the Museum.

Certainly some of the district court's analysis of the merits is applicable to plaintiffs' assertions against the Museum in this interesting case. But plaintiffs correctly point out that the district court did not address the merits of their claims against the Museum. They allege that their discovery related only to jurisdictional issues. We note that the Museum, as successor to Laura Gilpin by bequest, and as owner of the negative of the Benally photograph,

---

**4.** Ordinarily, a gift is the unilateral action of the donor, and a nonresident's receipt of a gift from a resident of the forum under a will executed and probated in the forum would not be purposeful activity subjecting the nonresident beneficiary to jurisdiction there. But this is not an ordinary bequest to a fortunate and fortuitous recipient; the Museum acted purposefully to solicit a gift from a New Mexico resident.

may be in a different posture from the other defendants for purposes of applying statutes of limitations and because plaintiffs request injunctive relief against future use of the photograph. Thus, we do not treat the merits of plaintiffs' claims in the instant appeal; we believe they should be addressed first by the district court.

REVERSED and REMANDED for additional proceedings consistent with this opinion.